Good morning. Always a pleasure to appear before you, Your Honor. If it pleases the Court, my name is Patricia Berry, and I'm representing the four petitioners, Dennis Schollenburg, Hazel Hagey, Brenda Knudson, and Vicki Melton. I just quickly want to just review what the specified type of misconduct was, since that's the first element that has to be met by the government in sustaining this notice to exempt them or to prohibit them from working in the banking industry. The first one was presenting exempt W-4s. First of all, we have the disparate treatment argument. As the record shows, after I finished the hearing, I discovered from the discovery that was given to me very late that there were at least 12 employees, in addition to my clients, who were not having income taxes deducted. And yet my clients were selected out for being prohibited from working in the banking industry. Number two, the government never distinguished between the pre-Guterman exempt W-4s and the post-Guterman exempt W-4s. Barry Guterman, the bank attorney who was retained by FMB to sort out these issues, which actually were not very complex, and I don't know why it cost him $40,000, but anyway, that's another issue. But on these exempt W-4s, Barry Guterman said to the government, to Mr. Doar in particular, on September 29, 1999, we're going to stand by these clients, I mean, excuse me, we're going to stand by the petitioners unless and until we hear from IRS. IRS never got into the mix until after the termination, and even then, it was only for two exempt W-4s, Vicki Mountain and Robert Hagee. The fact that they had on hand, that is, FMB had on hand at least two exempt W-4s also undercuts the argument of the government that my clients never made sure that the exempt W-4s got to IRS. Okay, that gets to another issue. Employees don't mail in to IRS their exempt W-4s. They give them to their employers. Most W-4s are kept on hand by the employer, so the employer knows what he or she is to deduct in terms of income tax. In particular cases, like if there's a huge number of deductions that raises the suspicion of, you know, what's going on here, where you end up with zero deductions or an exempt, yes, the employer is supposed to forward them. Well, the testimony from Hoisington, the Paychecks Director, was, yeah, we got them, but we did not forward them because it's not our practice. Generally, we advise the employer to do so, but we don't have a record that we told FMB to do so. And yet, the commission still wants to hold my clients responsible in this mixed-up record for the exempt W-4s. Now, just quickly, one of the elements that has to be shown is, what was the effect of those exempt W-4s? Was there financial gain to petitioners? No, and let me explain. The government is going to get up and tell you, well, FMB paid off taxes. Well, they only paid off the taxes, the back taxes, back income taxes, because FDIC ordered them to do it, not IRS. Then FDIC bolsters its position by saying, this is what we're going to do. This is a substandard loan, which lowers the rating in the report of FMB, therefore going to the issue that maybe it created, it was not, it affected the soundness of the bank. Well, that's sort of, you know, that's a circular argument. Furthermore, I tried to introduce evidence of what was going on in the civil rights case before that incredible Judge Timlin. I think he walks on water. But anyway, one of the things is, we were in a settlement. And FMB was ordered by a highly respected mediator, who specializes in business law, charges a ton of money. We paid our $47.50 to go, to do the mediation, because FMB baked us to do a mediation. He said, look, FMB, put $500,000 on the table. What I was trying to introduce that for was to say that we believe that FDIC put the kibosh on the settlement, because then we would have used, of course we would have used the $500,000. We would have said, look, let's settle on an amount, and then we'll deduct from that the taxes that you paid. We weren't going to walk away from that debt. But we weren't allowed to do that, we believe, by FDIC, so they could come here to the Ninth Circuit and say, these were these bad people that forced FMB to pay $122,000 in their back taxes. IRS never ordered it. They never ordered it for the other employees that were not having taxes deducted. It doesn't make any sense. Let me turn to the indemnification letter. Hazel Haguey would be the first to tell you that she made that decision on her own, and so, therefore, the only people responsible would be Dennis, her boss, and herself. And she acted on the authority that she had had before. I put into the brief how she had had an indemnification letter for the accounting firm that, I can't ever say it, for a Brodnick accounting firm. And there was no reason, as far as she understood, because she had an understanding that the board had approved not just a nondeduction of income taxes, but the nondeduction of the FICA, based on what had occurred in the, I think it was the March 1998 meeting, where Finley says, he's the bank attorney, don't worry, we got everything under control, and we've approved all this nondeduction. He later turncodes, but without any substantial evidence to back up his turncoding testimony. Okay, so the indemnification letter was just something that she thought she could do. There was, it was not done to be dishonest. It was, she was very straightforward about it, and it was only in effect for eight months, and only affected the nondeduction of the FICA Medicare, which all got paid up by the time FDIC learned about what was going on in terms of these particular people. They were petitioners and their personal income taxes, and then having the nondeduction for FICA Medicare. The next reason that they said that the commission upheld their being barred from working in the banks was that these documents that they mailed to IRS. Now, the government could not, the FDIC would not have these documents had not my clients, in an abundance of candor and honesty, contrary to what the FDIC is saying about them, and caution supplied their, the board of directors had them put it into their personnel files, all of the documents they were sending to IRS. Had my clients not done that, of course, then FDIC would be arguing before Your Honors that they're very dishonest, and the proof is they never submitted these documents. But they were in there, they didn't have to give them to F&B. These were documents strictly dealing with the confidential relationship between IRS and my clients. That's all they were. If IRS said, hey, you know, you're full of hot water, we're onto you guys, we know all about you, we've got a special category for you kind of people. But the statute only prohibits the IRS from disclosing confidential documents, doesn't it? I mean, how does this violate the statute? Well, the, the, the, I cited Stokett's in my brief, and what happened is the Ninth Circuit said that he did have, the Navy attorney did have a legitimate claim for, for the dissemination of his IRS returns that he had put into his desk. Sure, by the IRS, but this is by the bank. This was a personnel file, and there's no indication that personnel files are part of, or that the FDIC should have ready access to in, in, in doing their reports, which you think of for banking records for this kind of, when you're doing your, your examination is what I'm trying to say, you want to think about loans. You want to think about the daily telling of money that came in. You want to see new accounts. You want to see their shares. You want to see that the, that they're liquid. You want to see that they're not destroying the bank in some, you know, the typical financial thing. But going into people's personnel files to grab their tax returns. The other thing is, is that they use tax returns, Your Honor, at the hearing. What do the tax returns have anything to do with except to be offered as exculpatory evidence that my clients at one time were taxpayers and that the IRS should have been on notice that something was askance. For two years they were getting returns from FMB saying that there were non-deductions of taxes for my clients and also for 12 or 15 other employees. They never went to FMB and said something has to be done about this. They never contacted FDIC and said something had to be done about this. That, that's the problem with the use of these documents, is that had my clients not been honest and straightforward, but for them to go into personnel files without a legitimate reason, this was not an embezzlement case. This was not a case where, you know, say Dennis Schoenberg had given himself huge loans. You know, the, what I, the research I've done is where they use their insider position to get loans that are just completely not justified or that they just drained the bank of all their assets. That wasn't happening in this case. Nobody is saying, not even the FDIC is saying that my clients were playing games with the income they earned. What they earned went to IRS every year for those two years that this went on. I also want to say that they, there was no benefit derived by my clients except for, well, I don't know if it was even a benefit because they weren't having their old age being accounted for with Social Security and FMB was not contributing. Anyway, I don't want to get into that argument, but for eight months, that as far as I could tell from this record that FDIC developed, for eight months the Social Security was not deducted. Then Guterman says, no, you've got to do it, it's against the law. FMB says pay your back FICA taxes, we'll pay it, they were all up to date, the federal government did not penalize them. So there was no harm to FMB and there was no benefit to my clients because they ended up paying. And I've already addressed this whole argument about the personal income taxes. There was no personal dishonesty in this case. I'm saying they were damned by them being very outspoken. In fact, the hearing got a little confusing because Mr. Clark was sort of on a rampage himself. And he would talk about how Mr. Schoenberg would discuss the vultures and eagles clothing. There's a lot of people that would use that without necessarily, you know, having the political philosophy that my clients have. But, so it was hard to talk about whether they were mad because my clients were open about their position. Although there was testimony that Mr. Schoenberg only discussed it with the board. He didn't go proselytizing within the bank itself. But I don't know exactly what they were trying to say because on the one hand they were saying they were dishonest and they were covert. And on the other, they were too open about their position. And in fact, in the March 98 minutes, which I have at my, let's see, I think it's, oh, I don't know, I'm sorry, I don't have the site right here. Oh, I'm sorry, yes, it's volume 1113. Gary Finley himself says, everything's been taken care of on the withholding, F&B's not going to have any problems. The employees themselves might get in trouble, but F&B won't, I'm paraphrasing. And then he says, we expect, it's our recommendation that the individual employees minimize their visibility in the community with regard to this particular issue. Now, if they wanted to go up on that issue, we could have addressed that. Because then we could have shown that the, that my clients were very discreet within the banking circumstances and that the proselytizing occurred at the Freedom Education Center, but not within the bank. Now, finally, I want to address the, quickly, not to deduct the FICA. I've already stated to your honors that that only went on for eight months and they cleaned up their act by the time FDIC learned about it. So that was taken care of and there was absolutely no harm that came to F&B. But I want to talk a minute also about the Board of Directors' responsibility. This is a no-brainer. I mean, I don't know if, before becoming judges, if you ever had a private law practice, but IRS has an 800 number that you can call in if you're a small business owner. They have free seminars. It's a no-brainer why they had to hire a $300-an-hour attorney to find out that an employer-to-employee relationship you can never not, you know, if you're legit, there's a lot of people being paid under the table, but this was a legitimized organization, that you can never not deduct FICA Medicare, as long as you're making a certain number of dollars per month. And at volume one, page 66, referring to that September 29, 1999 meeting, Mr. Doar himself said, look at Board of Directors, you've got to deduct this. You violated the law. But they allowed it to go on for eight months. And but what happened is everybody bailed out on my clients. Mr. Finley bailed out. Gitterman was trying to play games when he was testifying to the tune of $5,000 for his testimony about how he actually supported my clients in their exempt W-4s at the September 29, 1999 meeting. It wasn't saying that he agreed with the exempt W-4s, but he knew they had a right to test whether or not they were exempt. He was just concerned about them fooling around with the declaration under penalty of perjury. He just wanted him to, he just had them take that out. And then they went in. Mr. Doar himself said at the hearing that, yeah, those exempt W-4s were okay. The commission didn't distinguish, ALJ Scheib didn't distinguish between the so-called legitimized exempt W-4s and the non-legitimized exempt W-4s. In other words, pre-Gitterman exempt W-4s, bad. Post-Gitterman exempt W-4s, good. But they didn't distinguish. They just said you were bad people, and we impose this debt on FMB. And if I tried to say, wait a minute, listen to me, this is a civil rights case, and we're close to a settlement, and we're not trying to, you know, cheat FMB, we'll just use it as an offset. And have I gone too far? No, you've got four minutes left. Oh, four minutes left? Okay, I want to reserve some for rebuttal. I also want to say that that was the year, that was a banner year. FMB was doing very well, and my clients were testing the waters. And they were trying, they were keeping FMB informed. The FDIC just can't play games with the abundance of the minutes where the discussion of what was going on, where the two, Ms. Jasperson and Mr. Clark admitted that they knew what was going on. She said even as late as 1997. Frankly, I don't think it's anybody's business about the exempt W-4 other than the person within the organization of the employer who handles the, excuse me, the paychecks and IRS. I don't know of any law that required these four petitioners or anybody in this room that if they decide they don't have to, that they can do an exempt W-4. The only people who need to know is the person in the employer's organization who's going to write the paycheck and IRS. And that's what they did. Anyway, I'll reserve the rest for rebuttal. Thank you very much. Good morning. May it please the Court. My name is Jacqueline Tanner, and I represent the FDIC. This appeal turns on one issue, whether there was substantial evidence in the record before the Board to support the prohibition order. And we would submit that that order is warranted. There's beyond question, because all of the elements of the 80 elements of the statute, misconduct, harm to the institution and culpability were established. First, there's ample evidence of misconduct here. This wasn't an issue of the exercise of any personal rights vis-a-vis the IRS. This was an issue of bank management. These people were the bank. They were bank management, using the bank, acting on behalf of the bank, and causing the bank to engage in illegal activities. As the bank's auditors, and as Mr. Guterman, when he was brought in, repeatedly advised bank's management, it was against the law not to submit, to accept altered W-4s, which the bank, the bank's auditors, were not allowed to submit. It was against the law not to submit them to the IRS, the exempt W-4s, and that was the bank's responsibility. It wasn't paychecks' responsibility. Paychecks never got them. It was all computerized. It was the bank's responsibility to do it. The record shows that Ms. Hagey never checked to see if it was done until almost two years after, in spring of 1999, never knew whether the bank, or never checked to see whether that had been done. And also, the record suggests that she never believed the bank had to do it, rightly, or wrongly, as it turned out. Those were illegal acts. They caused the bank to file false forms, quarterly forms. They caused the bank to stop, and as Ms. Barry acknowledges, a simple call to the IRS would have told bank's management that they could not stop withholding FICA. That was required. All of these actions began in 1997. They didn't come to an end until Mr. Gudeman's report brought things to a head, and that wasn't until July of 1999. And for the period between August, I believe, 1997, and July of 1999, the W-4s, no valid W-4, had to be withdrawn. The W-4s had been submitted, exempt W-4, to the IRS. The exempt W-4s, which Mr. Gudeman accepted, were accepted in July of 1999. For all of 1998, the invalid W-4s were operative, or were inoperative, as the case may be. On the question of harm, and let me go back on the misconduct of the W-4s. The fact that the board didn't take action was really explained in the testimony before the ALJ. The board's attorney was relying on representations made by the bank's management that the proper forms had been sent to the IRS, proper exempt forms. He says he's not a tax lawyer, he never, maybe he should have looked behind to see what exactly the forms that were needed were. He didn't, but he was relying on bank management that represented to him that all of the proper steps had been taken to protect the bank. And in fact, they hadn't. And the auditors discovered that in 1998, and informed bank's management that they were breaking the law by using the bank in that manner. They were causing the bank to break the law, that's the issue. The harm to the bank is also beyond question. Not only did the bank make the payment of the back taxes, which was never repaid, even though the bank made demand, the actions of the respondents who were bank managers exposed, instead of protecting the bank, they exposed the bank to numerous potential liabilities, both civil and criminal. I believe on page 90, 175 of the record, Mr. Guterman outlines all of the potential civil and criminal penalties that the bank was exposed to. And the suggestion that the bank should have waited until the IRS caught this problem before cutting off these potential risks to the bank is simply unreasonable. The bank properly took the advice of all of the tax experts available to it and made the payment, cut off the penalties, and went ahead and required the refiling of the W-4s. I think it's also clear that the risk was harm, that there was personal gain. They still haven't repaid the money that was sent off to the IRS on their behalf. The conduct did evidence continuing disregard for the safety and soundness of the bank. If by picking up a phone and calling an 800 number, they could have easily discovered that their plan to cease withholding on FICA was illegal, they should have done that in their role as bank managers. To do otherwise is to act in complete disregard of the soundness and safety of the bank, and for their own benefit, to promote their own agenda. There's evidence in the record that they misled the bank's board, again, by assuring the bank, the board, that they had indeed filed proper, valid, exempt, unaltered, exempt W-4s when they actually had not. And didn't even check on the situation until March of 99. Again, each of the elements has been more than amply supported. The board was justified in issuing the prohibition order, and if there are no further questions, I'll take my seat. Thank you. Your Honor, with respect to the altered W-4s, even though Mr. Gooderman testified that these altered W-4s may have created, could have caused problems for FMB, nothing ever happened to FMB. As a matter of fact, the exhibits that were submitted by FDIC, which were the, they were two form letters sent by IRS regarding the, it was a March 99 exempt W-4 of Vicki Melton and of Robert Hagee. And they, and all they did was send a form letter saying, start deducting, zero deductions, one exemption. That's the punishment that you get if the IRS concludes that the exempt W-4 does not have validity. There was no written letter saying, oh, we're going after you, FMB, because these exempt W-4s were altered in a way that IRS was not happy. Again, even now in oral argument, I feel there's some equivocation. Now they're down to altered exempt W-4s rather than simply exempt W-4s. IRS made no distinction. Why is FDIC doing? That's the problem in this case. FDIC got into the business of trying to interpret IRS law. And they presented, they again, even in response to my argument, haven't shown how the bank was harmed in any way. They didn't get any penalties. There was nothing, no action taken by IRS. It was all taken by FDIC. She talks about that this went on from August of 97 to July of 99. Well, it was established at the hearing that Mr. Schoenberg filed a tax return for 1997. So somehow he's exempted from 1997. But if the court reviews the record, the evidentiary record, the non-deduction for FICA went on, as far as we can tell, from this record developed by FDIC, for only eight months. And then they came in and, or rather retained Mr. Goodman, and Goodman says, hey, you can't do that. It's got, you know, we've got to clean up the act. They were ordered to clean up your act, pay those back taxes they did. They talked about, Ms. Tanner talked about misleading the bank, and she talked about the unaltered exempt W-4s. No, there was general language. As far as my clients were concerned, they had submitted the valid documents that were necessary to not have to pay their income taxes. Now, the, with respect to the 800 number or taking these free seminars on how to do taxation, it's a two-way street here. The board was very much informed as to the non-deduction issue of FICA Medicare. The exempt W-4s, my position, Your Honor, is that the, that is something strictly between the employee and IRS. Once IRS steps in and tells FMB to start the exemptions and one deduction, then, then if my clients had tried to subvert that, definitely that would have caused harm. No kidding. But see, that never happened. Until that would take place, as Mr. Goodman said on September 29, 1999, the exempt W-4 business was strictly an issue between my clients and IRS. FMB simply becomes a conduit. FMB gets directions from the employee, as any employer does, on a W-4. How many deductions do you want? And everybody has their reasons, just like the other 12 employees. Somehow they presented some exempt W-4 or a W-4 that had like a gazillion deductions, so they ended up with zero taxes being deducted. But they weren't selected out for prosecution. And I submit, they didn't bring a civil rights action, saying they were wrongfully terminated against the very people who are prosecuting them in this case, and of course prosecuting them in criminal action. If you have, oh, let me just say this. On the auditors, they approved the 1997. They weren't worried about the non-exempt. They had a bunch of people not paying taxes. They were worried about the FICA Medicare. That got cleaned up. Thank you for your argument, counsel. The matter just argued will be submitted and the court is adjourned. Thank you. Go ahead, I want to hold it so it doesn't get turned on you. Thank you. Thank you. Thank you. Thank you.
judges: Browning, Magill, Rymer